GRAY ET AL. *v.* RIDEOUT

[No. 115, October Term, 1947]

*Decided March 19, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Paul R. Kach,* with whom was *Louis Rothschild* on the brief, for Carson Gray and others.

*Wilfred T. McQuaid,* with whom was *Jo. V. Morgan* on the brief, for L. L. Donnally.

*Webster S. Blades,* with whom were *Blades & Rosenfeld* and *Paul J. Yeager* on the brief, for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

Pursuant to the provisions of the Annotated Code, Article 93, Section 151, the Orphans Court of Baltimore City notified all persons claiming as distributees of Mary Belle Davis, deceased, intestate, to appear, file and establish their claims. Testimony was taken at a number of hearings, and after a lapse of nearly 10 months an order was passed by two of the judges hearing the case (the third meanwhile having retired) awarding the entire net estate to the administrator of the claimant, Lewis T. Jones, who had died after the hearings, but before the decision. This order, from which the two appeals here are taken, was based upon a finding that Jones was the only first cousin of the decedent and the nearest of kin.

One appeal is by the administratrix of Mary Lyles Potts, who also died during the progress of the case, and who also claimed to be a first cousin. The other appeal is by 10 grandchildren of Hannah Bowie, who was an aunt of the decedent on the maternal side. These Bowie descendants are, therefore, first cousins once removed, (sometimes called second cousins) of the decedent, and can take only if there are no first cousins (Code, art. 93, Sec. 138). Their relationship is established by the testimony, and is not contested, although not admitted. The first inquiry, therefore, is whether either Jones or Potts or both, were first cousins. If either appears to bear that relationship to the decedent, the Bowie descendants do not inherit. If neither are first cousins, the Bowie descendants will inherit, either the entire estate, or will share with other relatives of equal degree, if there are any.

The decedent was an aged colored woman who was never married. Her parents and her brothers predeceased her, the brothers dying unmarried and without descendants. She was born in Montgomery County, near Damascus, and was the daughter of Benjamin Davis and Harriet Davis. She had lived in Baltimore for at least 35 years before her death, at which time she was between 75 and 80 years of age. Her estate was variously estimated at from $15,000 to $20,000. These facts are conceded by all parties.

The Potts claim is based upon the supposed relationship of the father of the claimant to the mother of decedent. This father is said to be William Lyles, claimed to be the brother of Harriet Davis. This claim is, therefore, on the maternal side, and the claimant, if correct in her statement of her pedigree, would be a first cousin of the parents of the Bowie grandchildren. She and most of the grandchildren lived in Montgomery County, and much of the testimony as to both claims is given by residents of that county. Many of the witnesses are old, and their recollections are not too clear in important particulars.

Mary Lyles Potts was said to be nearly 85 years of age when the testimony was taken. Among the witnesses who testified to her parentage was Bertha Ziegler, a daughter of George Lyles, deceased, who was her brother. She said that her grandfather, William Lyles was the only brother of Harriet Davis. She had never seen her grandfather who died many years ago. Mary Potts' mother was Lydia. Lydia was buried in the church cemetery at Damascus. William Lyles was buried at Purdon. George Lyles, the father of witness would be 89 years old if he were living. Another witness was Albert Gray, 67 years old, who lived in Montgomery County. He knew George Lyles, and his mother Lydia, but never knew William Lyles. He was a cousin of the decedent on the paternal side, but was no relation to William or George Lyles. He knew George's sister, Mary Lyles Potts. Lydia Donnally, afterwards named admin-

istratrix of Mary Potts, was 56 years old. She was George Lyles' daughter, and testified that his father was William Lyles, and that Mary Lyles Potts was William's daughter and George's sister. She also said she knew Benjamin Davis, the father of decedent, during his lifetime, and also his wife, Harriet. Her grandfather died before she was born. Maude Lyles Gray Wilson, now living in New York City, was born in Damascus where she lived until she was about 20 years old. She was also a daughter of George Lyles, who was, she testified, a first cousin of Mary Belle Davis, the decedent. She said her aunt, Mary Potts, was about 75 years old. Her father often spoke to her of her grandfather, William Lyles. He was a brother of Mary Belle Davis's mother, Harriet. George Gray lived in Montgomery County and said he was 77 years old. He knew Mary Potts, who was about his age, and he formerly knew her mother "Liz" Lyles. Her father was dead before the witness went to Damascus to live, which was when he was a boy eight years old. Mary Potts was George Lyles' sister. These witnesses were not claimants, and those who were children of George Lyles were testifying somewhat against their own interest when they said that Mary Potts was a sister of their father, although to support any right of theirs as first cousins once removed, they would have to prove William Lyles was an uncle of decedent. However, they none of them made any claim, and all supported the claim of Mary Potts. They did, however, have a prospect (since realized) of succeeding to Mary Potts' claim as her next of kin.

Bessie Washington, a granddaughter of Harriet Bowie and one of the appellants, said that George Lyles and Mary Potts, both of who she knew, were brother and sister, and that Dorothy Ziegler, Lydia Donnally and Maude Gray were George's children. She knew decedent and had heard her say that Mary Potts was her cousin. This witness said Mary Potts was her second cousin on her mother's side, and was the child of Bill Lyles, who was supposed to be Hannah Bowie's brother. Her

mother had told her this. Roberta Crampton, another of the Bowie grandchildren, said she lived at one time with the decedent who was her mother's first cousin. Her grandmother, Hannah Lyles Bowie, was supposed to be a sister to Bill Lyles. Bill Lyles was the brother of Harriet Davis. Marshall Halsey, another one of the Bowie grandchildren, had heard of Bill Lyles, but had never seen him. His mother used to call him Uncle Bill Lyles, and said he was her mother's brother. He knew George Lyles, who was related on the mother's side. Called him Cousin George. Bill Lyles was supposed to be his father. Bill Lyles was buried before the time of this witness. These three last named witnesses, when they gave the testimony recited above, were clearly testifying against their own interest and their claims as first cousins once removed.

John Wesley Taylor, not a party to these appeals, but who claimed to be a cousin of decedent on her mother's side through his grandfather, and who would be a first cousin once removed if he established his contention, said that Mary Potts was a first cousin of decedent. This was also testimony against the interest of the witness.

Beatrice Sollers, a granddaughter of George Lyles, testified that Mary Potts was her great-aunt. She was informed by her father that Mary Potts was a sister of George Lyles. Nellie Gray, another granddaughter of George Lyles, said the decedent, whom she saw frequently, told her that George Lyles was her first cousin. She visited him and gave him money because he was paralyzed a good while before he died. Theodore Phillips, a great grandson of Hannah Bowie, said the decedent used to visit his mother, who was her second cousin, 25 or 30 years ago.

The above narrated testimony, much of it against interest, and largely from admitted relatives, seems to establish the relationship of Mary Potts as a first cousin of the decedent as well as it can be established under the circumstances of this case. Of course, much of

this is hearsay, which is admissible as to matters of pedigree, but it is difficult to see how it could be otherwise when the question is the relationship of a woman about 80 years old to a man who died 60 years before she did, and who would necessarily be remembered only vaguely, if at all, by those now living. There were witnesses who testified they never heard of Bill Lyles, among them Albert Gray, Maude Wilson, George Gray, Marshall Halsey, already mentioned, and Carson Gray, one of the Bowie grandchildren, and Louis Barnes who worked for the decedent for 30 years. But this testimony is not to the effect that there was no such person, but only that the witnesses had no knowledge of him. There are discrepancies and obvious mistakes, but on the whole we have come to the conclusion that Mary Lyles Potts was a first cousin of Mary Belle Davis, and therefore entitled to share in her estate. Whether she is entitled to all of it, or only half depends upon the validity of the claim of Lewis T. Jones. We, therefore, pass to an examination of the evidence as to his relationship with the decedent.

Jones claimed to be related to the decedent on the paternal side. That is, his contention was that he was descended from a sister of Benjamin Davis. If this is proved, the important question remains whether his mother or his grandmother was the sister of the decedent's father. If it was his mother, he is a first cousin. It it was his grandmother, he is a first cousin, once removed, and is not entitled to share the estate with Mary Potts.

When the claim on behalf of Jones was first filed, it stated that he was a second cousin. Benjamin Davis was said to have had a sister, Rebecca, whose daughter, Margaret, was the mother of Jones. This claim was filed by his attorneys, without his signature, and it is explained by them that Jones was originally represented by another lawyer who died. The first lawyer had investigated the case, and when the time came to file a formal claim, Jones was critically ill in a hospital, and

his attorneys prepared and filed the claim from the notes made by his first attorneys. Subsequently, the lawyers located the witness, Fannie Brown, among others, and then changed the claim of their client, and contended that he was a first cousin. The testimony upon which this claim is based is chiefly that given by Louis Barnes, Fannie Brown, Thornton Scroggins and Etta Belle Sampson. Jones himself was unable to testify or to give a deposition, or even to explain what he thought was his relationship.

Barnes was a man 74 years of age. He had known decedent for 30 years, becoming acquainted with her through one of her brothers who is now dead. He lives in Baltimore and worked for her, repairing houses of which she had seven. He worked for her until she died, and has a claim against her estate. He met Jones about 25 years ago, and used to see him twice a year. Jones lived in Rhode Island in the summer and Florida in the winter, and stopped with the decedent when he came through Baltimore. He had a trunk at her house. Jones' mother was named Margaret. She lived at Lutherville. She has been dead six or seven years and was nearly a hundred when she died. The witness first met her 20 odd years ago at the house of decedent. He sometimes would drive decedent out to Lutherville to see her. He had heard decedent say, after her brother died, that she and Margaret were the only two close relations. They always called each other Cousin Marg and Cousin Belle. Benjamin Davis was decedent's father and Margaret was supposed to be his sister. He heard that from decedent and Margaret at various times when they were talking it over. When the decedent and Lewis Jones were together they addressed each other as "cousin". The decedent frequently said she had no relatives but Jones. At the time the witness testified, Lewis Jones was in a rolling chair and sometimes talked all right and sometimes didn't. Witness was friendly to Jones, but had put in a claim against the estate, and Jones did not approve of it, and had told him he didn't want him

to testify. He came to court because somebody else wanted him to testify, and then when he wasn't called, he brought it to the attention of Jones' attorney. The decedent told him that Benjamin Davis was a brother of Margaret Jones. She told him that maybe once or twice every two or three months. She would tell the same thing every now and then when she was talking. The only relative whose name she repeated, and she repeated that regularly, was Margaret Jones. Martha Ann Rawlings, who had been with the Afro-American newspaper for over 30 years, testified that she knew the decedent and the latter had told the witness that Lewis Jones was a cousin, but she never said whether he was first or second. She told her that she had a lot of cousins. Etta Belle Sampson, formerly a school teacher, then a missionary, also a lawyer, according to her statement, had known the decedent for about 10 years, and did a lot of writing for her. She had met Lewis Jones at the house and said he came there during his vacation when he was going from north to south and vice versa. Sometimes he would stay 10 days. The decedent told the witness that Jones was the only first cousin she had. She called him Lewis and he called her Cousin Belle. Fannie Brown met the decedent in 1940 when she ran an errand for her, and they thereafter became friends, and she ran errands for the decedent and wrote letters for her. During the period of her acquaintance she saw Jones on the occasions of his visits twice each year. Both the decedent and Jones would say that they were the only two living. She heard the decedent say that Jones's mother was her father's sister, and that Jones was the only blood relation she had. There are two letters in evidence which this witness wrote for the decedent to Jones, one in January 1925 and one in March 1925. Both addressed him as "Dearest Cousin" and are signed as being from his cousin. There is nothing in these letters about the relationship, except that in one of them decedent expresses her shock at hearing that Cousin Lizzie had passed away. Cousin Lizzie was Lewis Jones's

wife.. Thornton Scroggins knew the decedent, knew Lewis Jones and knew Lewis Jones's mother. He went out with the decedent and Jones to see the mother in Lutherville. He said that the decedent had called Margaret Jones "Cousin Margaret", but this didn't strike him as odd. Margaret Jones called the decedent Cousin Belle. He thought Margaret Jones was over 70 when he saw her about 1937. Lewis Jones, he thought, was about 80 at the time he gave the testimony. Maralice Jones Rideout, daughter of Jones, said she remembered her grandmother Margaret who died about 12 years ago and when she died she was about 80. She said her father was 80 at the time she testified, and she also said that the decedent and her grandmother addressed each other as Cousin Moll and Cousin Belle.

The evidence in the case indicates that Jones and the decedent were about the same age, within a few years of each other. The evidence as to the age of Jones's mother is conflicting, running from 70 years to 100 years at the time of her death. The witness Barnes testified that the decedent said she was going to be 100 because she had a cousin, presumably Margaret Jones, who lived to be 112. However, when no records are kept of ages and people get very old, there is always great difficulty in getting any exact information. Jones's mother, however, must have been considerably older than he was and, therefore, considerably older than the decedent who was about his age. If we are, therefore, to attach any importance to the age question, it tends to show that Margaret Jones was an aunt rather than a first cousin of the decedent. And we have the direct testimony of the witnesses above related that the decedent told them that Margaret Jones was her aunt.

The only testimony about Rebecca, stated in Jones's first claim to be Margaret's mother comes from Albert Gray, supposed to be a grandson of Hester Gray who was a sister of decedent's father. He said Benjamin Davis had two sisters, his grandmother Hester Gray and Rebecca Gooden. Rebecca had two sons, John and

Robert, both of whom died without leaving a family. He also said that Rebecca had no daughters. He did not know her, but he knew the two boys. This witness is the only relative of the decedent on the paternal side who testified, with the exception of his sister Alverta Thomas. The latter was asked nothing about any sisters of Benjamin Davis, except her grandmother Hester Gray. Neither of these witnesses mentioned a sister Margaret, and Albert Gray, as we have related, denied that Rebecca, who he said was a sister of Benjamin Davis, had any daughters. There is, therefore, no testimony by any paternal relatives of decedent showing any relationship of Margaret Jones to Benjamin Davis. Proof of this is confined to statements alleged to have been made by the decedent to the witnesses Barnes and Fannie Brown.

It is testified by all witnesses for Jones that the decedent called Margaret Jones "cousin" and Margaret Jones called her "cousin", which seems to be a strange method of address between an aunt and a niece. However, this is not controlling in the face of the definite testimony that the decedent said Margaret Jones was her aunt, the sister of her father, and also the undeniable fact that she saw more of Margaret Jones and of Lewis Jones than of any one else, and that she said they were her nearest relatives. The Orphans Court saw the witnesses Barnes and Fannie Brown, and heard them testify, and the two judges who signed the order appealed from evidently believed the testimony of these witnesses that the decedent had said that Margaret Jones was her aunt. Under all the circumstances of such a complicated matter we are not disposed to disturb their finding that Lewis Jones was a first cousin of the decedent, although, as we have indicated, we think that Mary Lyles Potts was also a first cousin.

In view of our conclusion, the order of the Orphans Court will have to be reversed, and the case remanded in order that an order may be passed directing the division of the net estate of the decedent between the

estates of the two first cousins, Mary Lyles Potts and. Lewis T. Jones.

> *Order reversed and case remanded for the passage of an order in accordance with this opinion.  Costs to be paid out of the estate of Mary Belle Davis.*